14-1820-cr
United States v. Moreno

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: March 12, 2015     Decided: June 5, 2015)

Docket No. 14-1820-cr

- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

Appellant,

- v.-

FRANK MORENO, a/k/a "Mo,"

Defendant-Appellee,

HENRY KEENE, TERRANCE NEAL, MAIKEL
MANGRA, RODNEY RANDALL, SHIROCKIE
KIRK, VITTORIO GEORGE, STEVEN HARTRIDGE,
GREGORY WILSON, EL-HAJJ MOSES, a/k/a
"Little Elie," DUSHAN WILSON, a/k/a
"Lil Du," OMAR LEWIS, a/k/a "Tree,"
JUBBAR SINGLETON, a/k/a "Ja," ASAR
BRANDOW, a/k/a "Jamel," MARQUAS
BUCHANAN, a/k/a "Un," SAKENA KOCER,
a/k/a "Kills,"

Defendants.

- - - - - - - - - - - - - - - - - - -x

Before: JACOBS and LOHIER, <u>Circuit Judges</u>, and GERACI, <u>District Judge</u>.[*]

The government appeals from the orders of the United States District Court for the Northern District of New York (Hurd, <u>J.</u>), dismissing the indictment against Frank Moreno with prejudice and denying the government's motion for reconsideration. The district court held that Moreno's Sixth Amendment speedy trial right was violated because the government was responsible for a 27-month delay between the unsealing of the indictment and his arrest. We conclude that: (I) the government's negligence was not responsible for the entire delay, and (II) given the duration of the delay attributable to the government, Moreno made an insufficient showing of prejudice.

Reversed and remanded for reinstatement of the indictment.

> PAUL D. SILVER (Robert A. Sharpe, <u>on the brief</u>), <u>for</u> Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, New York, <u>for Appellant</u>.
>
> SAMUEL C. BRESLIN, Albany, New York, <u>for Defendant-Appellee</u>.

---

[*]    Chief Judge Frank P. Geraci, Jr., of the United States District Court for the Western District of New York, sitting by designation.

DENNIS JACOBS, <u>Circuit Judge</u>:

After the unsealing of an indictment charging Frank Moreno and others with narcotics conspiracy, every defendant except Moreno was promptly arrested. Notwithstanding their efforts, federal agents were unable to find Moreno until his arrest by state police officers during a Bronx traffic stop, 27 months later.

Moreno moved to dismiss the indictment with prejudice because the pre-arrest delay violated his Sixth Amendment right to a speedy trial. He asserted (through counsel) that prior to his arrest he was unaware of the federal indictment, and was living openly at his sister's apartment at 40 Morrow Avenue in Scarsdale, New York ("40 Morrow Avenue"), which federal agents never searched. The motion was granted by the United States District Court for the Northern District of New York (Hurd, <u>J.</u>), which held that the pre-arrest delay was entirely attributable to government negligence and that Moreno suffered prejudice. The government's motion for reconsideration was denied.

We conclude that: (I) the entire pre-arrest delay cannot be attributed to the government's negligence, and (II) Moreno did not adequately show prejudice.

3

## BACKGROUND

A sealed indictment, filed May 20, 2011, charged Moreno and fifteen others with conspiracy to distribute cocaine and heroin. In anticipation of a takedown operation to arrest the defendants, agents of the Federal Bureau of Investigation ("FBI") interviewed informants and ran database searches. As to Moreno, informants told the agents that he could potentially be found at one of two locations in the Bronx: 716 Beck Street and 2816 Roebling Avenue. A New Jersey database listed "40 Morrow Avenue, Scarsdale, NY" as Moreno's address at the time of a 2006 arrest, while a New York database listed "40 Mattow Ave. Apt. 2R Srarsdale, NY [sic]" as the address associated with Moreno's prior term of probation, which ended in 2010. Ultimately, only the two Bronx addresses were included in the final operation plan for the takedown.

On May 26, 2011, the indictment was unsealed and FBI agents executed simultaneous arrests of individuals charged in several related indictments ("Operation Block Crusher"). All other defendants targeted by Operation Block Crusher were successfully found and arrested during or in the days immediately following the takedown.

4

A team of eight agents in the FBI's New York City office were assigned to find and arrest Moreno. Pursuant to the operation plan they searched at the two Bronx addresses, unsuccessfully. Individuals interviewed at one of the Bronx addresses told agents that they had seen Moreno there "within days." Later that day, agents entered Moreno's information into the National Crime Information Center ("NCIC"), an FBI database shared with other federal and state law enforcement agencies. On July 12, 2011, NCIC returned a potential lead on Moreno, which was forwarded to the FBI's Albany office. The record does not show whether the FBI followed up.

On June 14, 2012, a cooperating witness told FBI agents that Moreno had been dealing kilogram quantities of cocaine from his Bronx apartment as recently as 2010. In response, FBI agents ran a search with Con Edison to locate Moreno's utility bills, and submitted a request to the Airline Reporting Corporation to search its databases for Moreno's name, date of birth, and social security number.[1] Neither effort proved fruitful.

---

[1]   The Airline Reporting Corporation is a "[a]n airline-owned company" that, among other services, resolves ticketing transactions between over 200 airlines and railroads and approximately 13,000 "points of sale," such as travel agencies. https://www.arccorp.com/aboutus/index.jsp.

On September 6, 2012, an informant arrested in Virginia told agents of the Drug Enforcement Administration ("DEA") that Moreno was his heroin supplier. According to this informant, Moreno was dealing drugs out of a residence in the "middle projects" at Randall Avenue in the Bronx. The informant provided agents with the cell phone number of one "Fluffy," who dealt heroin with Moreno. DEA agents relayed this information to the FBI. In November 2012, FBI agents sought and obtained account information and historical cell site data for Fluffy's cell number, but were unable to discern a discrete location where Fluffy (or Moreno) could be found. Federal law enforcement took no further steps to locate Moreno after November 2012.

Ten months after the federal investigation became inactive, Moreno was arrested in the Bronx on September 9, 2013. The arresting officers discovered the outstanding federal warrant and transferred Moreno to federal custody for prosecution in the Northern District of New York.

Moreno moved to dismiss the indictment with prejudice on the ground that the 27-month delay violated his Sixth Amendment right to a speedy trial. His counsel averred that, during that time, Moreno had been living openly at his sister's apartment at 40 Morrow Avenue, and submitted in support an affidavit

6

from the sister, Teresa Moreno, along with her tax returns and other documents.[2]

The district court granted the motion, finding that each of the factors under Barker v. Wingo, 407 U.S. 514 (1972), militated in favor of dismissal. United States v. Moreno, 997 F. Supp. 2d 165 (N.D.N.Y. 2014) ("Moreno I"). The court's analysis focused chiefly on the reason for the delay--the second Barker factor-- and concluded that the entire pre-arrest delay stemmed from the government's "anemic" investigation and "fail[ure] to exercise reasonable diligence in its efforts to locate [Moreno]." Id. at 177, 181. The court credited Moreno's assertion that he "maintained 40 Morrow Ave. as his legal and mailing address for the past eight years" and faulted the government for not investigating that address. Id. at 170, 175-76.

The government's motion for reconsideration was denied. United States v. Moreno, 12 F. Supp. 3d 313 (N.D.N.Y. 2014) ("Moreno II"). The motion adduced evidence that Moreno did not live at 40 Morrow Avenue, including an affidavit from an FBI agent stating that he interviewed two long-time employees of 40

---

[2]     Other documents included: (1) an undated printout of a Lexis-Nexis search listing 40 Morrow Avenue as Moreno's secondary address (but listing a Bronx address as his primary address); (2) a printout from the New York state court website, reflecting a pending civil action by Moreno in Bronx Supreme Court; and (3) an undated juror delinquency form sent to Moreno at 40 Morrow Avenue.

Morrow Avenue neither of whom recalled seeing Moreno there in the preceding

four years.  In view of that newly submitted evidence, the court clarified that

Moreno I's "finding of negligence was not based on an 'unfavorable' resolution

of" the issues of "'whether and when' Moreno lived at 40 Morrow Ave.," but on

"the Government's failure to proffer any evidence of due diligence in the

one-year period prior to defendant's arrest by the N.Y.P.D."  Id. at 316.

The government appeals Moreno I and Moreno II.  We reverse and remand

for reinstatement of the indictment.

## DISCUSSION

The Sixth Amendment provides that "[i]n all criminal prosecutions, the

accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.

That right protects both the accused's interest in "decent and fair procedures"

and the public's interest in a speedy adjudicative system.  Barker, 407 U.S. at 519.

It is "triggered by arrest, indictment, or other official accusation," Doggett v.

United States, 505 U.S. 647, 655 (1992), or (in cases such as this) by the unsealing

of a sealed indictment, United States v. Watson, 599 F.2d 1149, 1156 (2d Cir.

8

1979).  Dismissal of the indictment with prejudice is "the only possible remedy." Barker, 407 U.S. at 522.

"[T]he right to speedy trial is a more vague concept than other procedural rights."  Barker, 407 U.S. at 521.  The Supreme Court has identified four factors that must be balanced when considering whether the right has been violated: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  Id. at 530.  The first factor, the length of delay, also operates as a threshold inquiry: a Barker analysis is triggered only if a delay is so long as to be "presumptively prejudicial."[3]  Doggett, 505 U.S. at 652 (internal quotation marks omitted).  Once an analysis is triggered, no one factor is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial," and all "must be considered together with such other circumstances as may be relevant."  Barker, 407 U.S. at 533.

---

[3]  As discussed further below, the notion of a delay that is "presumptively prejudicial" (i.e. long enough to trigger a Sixth Amendment inquiry) should not be confused with a delay that is so long as to cause "presumptive prejudice" (i.e. prejudice that need not be specifically shown).  Compare Doggett, 505 U.S. at 652, with id. at 655-56.  The former bears upon the need for a Barker analysis, whereas the latter bears upon the merits of that analysis.

Dismissal of an indictment for a constitutional speedy trial violation is reviewed for "abuse of discretion."[4] United States v. Ghailani, 733 F.3d 29, 43-44 (2d Cir. 2013). We must defer to the district court's findings of fact, which may be reversed only if clearly erroneous. Id.; Doggett, 505 U.S. at 652-53. Given a particular set of factual findings, however, the district court's legal conclusion as to whether the Sixth Amendment was violated commands little deference: "a determination whether someone's constitutional rights have been violated is rarely viewed as a matter truly left to district court 'discretion.'" Ghailani, 733 F.3d at 44. On a given factual record, "a district court is in no better position than a reviewing court to undertake the required balancing"; "it is improbable that we would approve opposite decisions as to two identically-placed defendants on the basis that each decision was within the trial judge's discretion." Id. So if we conclude that the district court struck the incorrect balance, we must reverse.

\* \* \*

---

[4] A district court's denial of reconsideration is also reviewed for abuse of discretion. RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 316 (2d Cir. 2003) (per curiam).

10

We find no clear error in the district court's findings of fact, except in one very limited respect discussed below.[5] Moreover, we agree with the district court that the length of delay was sufficient to trigger a Sixth Amendment analysis (the first Barker factor) and that Moreno timely asserted his speedy trial right (the third Barker factor). We reverse because the district court misapplied the second and fourth Barker factors: (I) the court ruled that government negligence was the reason for the entire 27-month delay notwithstanding that (according to the court's factual findings) the government made reasonable efforts to locate Moreno up through November 2012; and (II) the court improperly weighed the prejudice factor in favor of Moreno.

**I**

Although no single Barker factor is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial," 407 U.S. at 533, the second factor--reason for delay--is often critical. The Sixth Amendment is rarely violated by delay attributable entirely to the defendant, see Vermont v. Brillon,

---

[5] The court stated that the pre-arrest period of government inactivity lasted one year, when in fact it lasted only ten months.

11

556 U.S. 81, 90 (2009), or by delay that serves some legitimate government purpose, Doggett, 505 U.S. at 656 ("The government may need time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down."). See also Barker, 407 U.S. at 531 ("[A] valid reason, such as a missing witness, should serve to justify appropriate delay."). By the same token, delay stemming from deliberate government misconduct weighs heavily in favor of finding a violation. Doggett, 505 U.S. at 656; Barker, 407 U.S. at 531.

"Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground." Doggett, 505 U.S. at 656-57. "[W]henever an individual has been officially accused of a crime, not only is the government charged with the burden of bringing the accused swiftly to trial, but it is under an obligation to exercise due diligence in attempting to locate and apprehend the accused." Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir. 1988). Delay caused by the failure to use "reasonable diligence" in locating a defendant weighs against the government, Doggett, 505 U.S. at 656-57, although not to the same degree as deliberate misconduct, Rayborn, 858 F.2d at 91. The

12

following principles may bear upon whether the government acted with reasonable diligence.

First, courts should consider the diligence of the government's efforts based on what was known to the government at the time of the investigation, not what is known by hindsight after the defendant has been apprehended. "Once the defendant has been apprehended, it is easy to hone in on the leads that might have led to the defendant earlier and to argue from only those clues that the path had been obvious all along." United States v. Valiente-Mejia, No. 04 Cr. 772 (NRB), 2009 WL 3401210, at *8 (S.D.N.Y. Oct. 19, 2009). Investigators have a certain expertise, and few judges are trained in the field; so while government assertions of diligence should not be accepted without scrutiny, courts must give the day-to-day tactical decisions of law enforcement a measure of deference. Cases of government negligence have typically involved the failure to make *any* "serious effort" at investigation. See, e.g., Doggett, 505 U.S. at 652. An investigation is not unreasonable simply because it misfires or fails of its purpose, or because other measures would have been more fruitful. "[T]he precise amount of effort that is required is apt to vary depending on the circumstances of the case." Rayborn, 858 F.2d at 90. So long as the government

13

made serious investigative efforts calculated to achieve arrest, it acted reasonably for Sixth Amendment purposes.  See Doggett, 505 U.S. at 652; see also Rayborn, 858 F.2d at 90 ("[L]aw enforcement officials are not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown.").

Second, even if the government acted negligently, negligence does not weigh in favor of the defendant unless it actually lengthened the delay.  That is because negligence is not a "*reason* for the delay," Barker, 407 U.S. at 530 (emphasis added), unless there is a causal connection.  Thus, delay cannot be attributable to a failure of diligence if diligence would have been futile.  Cf. United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988); United States v. Diacolios, 837 F.2d 79, 83 (2d Cir. 1988).

It need not be found that government negligence is the sole cause for delay; the government can be at fault even if its negligence was one among other causes and, indeed, even if the defendant deliberately sought to elude capture.  See Rayborn, 858 F.2d at 90.  Nor must causal linkage be established by direct evidence; in some cases, the requisite link can be established solely by circumstantial evidence, such as evidence that the defendant "lived openly under

14

his own name, and stayed within the law." Doggett, 505 U.S. at 649-50.

Nevertheless, without some identifiable causal connection between the failure of reasonable diligence and delay, the government's negligence--however deplorable or unprofessional--was not a "reason for the delay." Barker, 407 U.S. at 530.

Third, and relatedly, if the government acted with diligence during some period of the delay, only periods of the delay attributable to negligence should be weighed against the government. The pre-arrest delay in Doggett lasted over eight years, but the Supreme Court weighed only the six years attributable to government neglect in the Sixth Amendment analysis. 505 U.S. at 652, 657-58. Any contrary rule would reward a defendant's flight from capture.

In light of the foregoing, the district court's analysis of the reason for delay, although thorough, was erroneous.

First, the court concluded that the government's investigation was "anemic" based on the government's failure to do more than it did. However, as the court found, the government: (1) entered Moreno's information in the NCIC database; (2) interviewed informants about Moreno on at least two separate occasions after the indictment was unsealed; (3) requested Moreno's records from

15

a utility company; (4) requested ticketing information from the Airline Reporting Corporation; and (5) obtained cell site data from a suspected associate. Moreno I, 997 F. Supp. 2d at 170 n.5, 171. The government could have taken additional steps that would have improved its chances of finding Moreno, but the salient consideration is that the efforts it did take were diligent and reasonably calculated to lead to capture. Rayborn, 858 F.2d at 90. Those efforts spanned the period from May 2011 to November 2012, well over half of the pre-arrest period.

Second, the court declined to make the findings necessary to conclude that the failure to search 40 Morrow Avenue was causally related to the pre-arrest delay. True, Moreno I placed considerable emphasis on documentary evidence (including Teresa Moreno's tax returns and Moreno's juror delinquency notice) suggesting that Moreno "maintained 40 Morrow Ave. as his legal and mailing address for the past eight years." 997 F. Supp. 2d at 170. But Moreno II expressly disclaimed reliance on a finding that Moreno ever lived there or that investigation of that address would have improved the government's chances of finding him. 12 F. Supp. 3d at 316 ("Although the Government obviously disputes 'whether and when' Moreno lived at 40 Morrow Ave., [Moreno I's]

16

finding of negligence was not based on an 'unfavorable' resolution of that peripheral issue.").

Third, the court attributed the entire 27-month delay to the government, Moreno I, 997 F. Supp. 2d at 180, notwithstanding its finding that the government exercised diligence for more than half of that time, see Moreno II, 12 F. Supp. 3d at 317.[6] While the full period of delay has bearing on other aspects of the Barker analysis,[7] the government can be faulted only for the ten-month period (November 2012 to September 2013) during which it ceased to exercise reasonable diligence.

For the foregoing reasons, we conclude that the district court misapplied the second Barker factor.

_____

[6] Relying on "the absence of any dated evidence beyond September 6, 2012," the district court described the period preceding Moreno's September 2013 arrest as a "one-year period." Moreno II, 12 F. Supp. 3d at 317. The court overlooked that, in the same affidavit documenting the September 6, 2012 investigation, the government described a November 13, 2012 follow-up. The pre-arrest period of inactivity therefore lasted ten months, not twelve.

[7] For example, the entire length of delay should be considered in determining whether a Sixth Amendment inquiry is triggered in the first place. See Ghailani, 733 F.3d at 43.

17

## II

The district court also misapplied the fourth <u>Barker</u> factor: prejudice. Excessive pretrial delay can inflict three kinds of cognizable prejudice: (i) "oppressive pretrial incarceration," (ii) "anxiety and concern of the accused," and (iii) "the possibility that the defense will be impaired." <u>Barker</u>, 407 U.S. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." <u>Id.</u> It is undisputed that the first and second categories of prejudice are not implicated here: Moreno was at liberty until his September 2013 arrest, and the district court found that he was unaware of the indictment prior to the arrest. <u>Moreno I</u>, 997 F. Supp. 2d at 179. Accordingly, we focus on the possibility of trial prejudice.

Delay "does not per se prejudice the accused's ability to defend himself" because the government bears the burden of proof when the case comes at last to trial. <u>Barker</u>, 407 U.S. at 521. Moreno suggests--with no evidentiary support[8]--that he suffered trial prejudice because he may no longer remember certain phone conversations that the government plans to introduce against him.

---

[8] This suggestion was made by Moreno's counsel at oral argument before the district court. <u>See</u> <u>Moreno I</u>, 997 F. Supp. 2d at 180.

18

Moreno I, 997 F. Supp. 2d at 180.  That conjecture is insufficient for a

particularized showing of prejudice in this case.  The phone conversations at

issue were recorded, and thus fully preserved.  Insofar as Moreno may forget

context, the same may be said of the government's witnesses.  As the Supreme

Court has observed, fading memories often "work to the accused's advantage."

Barker, 407 U.S. at 521; see also Brillon, 556 U.S. at 90.[9]

In Moreno II, the district court acknowledged the inadequacy of Moreno's

proffer of actual prejudice, 12 F. Supp. 3d at 319 ("[Moreno I] did not rely on the

unsupported assertions of Moreno's counsel in analyzing the fourth Barker

factor."); the court instead relied on the premise that "affirmative proof of

particularized prejudice is not essential to every speedy trial claim," id. at 320

(quoting Doggett, 505 U.S. at 655).  Doggett held that a pre-arrest delay of

sufficient length can lead to "presumptive prejudice" even absent "affirmative

---

[9]    Moreno was arrested well within the five-year statute of limitations, and he
is no worse off than he would have been had the government indicted (and
arrested) him in September 2013 instead of May 2011: under that scenario, he still
would have been at liberty and unaware of the indictment until his arrest, and
the evidence still would have deteriorated--or not--to the same degree.  See
Doggett, 505 U.S. at 665, 669 (Thomas, J., dissenting).

19

proof of particularized prejudice." 505 U.S. at 655-56.[10] At the same time,

Doggett cautioned that "such presumptive prejudice cannot alone carry a Sixth

Amendment claim," id. at 656, and that "to warrant granting relief, negligence

unaccompanied by particularized trial prejudice must have lasted longer than

negligence demonstrably causing such prejudice," id. at 657.

This is not one of those exceedingly rare instances in which the length of

delay alone supports a showing of prejudice. In Doggett itself, "the

Government's negligence . . . cause[d] delay six times as long as that generally

sufficient to trigger judicial review." 505 U.S. at 658. We have regularly rejected

Sixth Amendment claims based on multi-year delays causing greater prejudice

---

[10] When referencing the length of delay for purposes of a Barker analysis, courts have used the phrase "presumptively prejudicial" (and its variants) to describe two different concepts. First, courts have used the phrase to describe a delay of sufficient length to make the threshold showing that a defendant was not tried with customary speed and thus to trigger a Barker inquiry in the first instance. See Doggett, 505 U.S. at 652. That inquiry focuses on whether the delay has reached some *threshold* length (usually one year), and bears upon whether a Barker analysis is *needed*. Id. at 652 n.1. Second, courts have held, following Doggett, that a delay may be so long as to cause "presumptive prejudice" that relieves the defendant of the burden of affirmatively showing prejudice. Id. at 657-58. This latter inquiry focuses on the delay *beyond* the threshold mark, and bears upon the *merits* of the Barker analysis. Here, the 27-month delay (of which ten were attributable to the government) was presumptively prejudicial in the first sense, but not the second.

20

than the delay in this case. Cf. Flowers v. Warden, Connecticut Corr. Inst., Somers, 853 F.2d 131, 133 (2d Cir. 1988) ("[W]e note first that the 17-month delay here, while lengthy, is nevertheless considerably shorter than those in other cases where we have found no speedy trial violation." (citing numerous cases)). Unquestionably, the ten-month delay attributable to the government here cannot sustain a Sixth Amendment claim absent "some additional compelling circumstance, such as bad faith by the prosecution or actual prejudice." United States v. Jones, 91 F.3d 5, 9 (2d Cir. 1996) (holding that dismissal of indictment was abuse of discretion when delay attributable to the government was twelve months).

The district court erred by weighing the prejudice factor in favor of Moreno.

**CONCLUSION**

We conclude that the district court misapplied the second and fourth Barker factors, and thereby abused its discretion in dismissing the indictment. We reverse the orders of the district court and remand for reinstatement of the indictment. To minimize additional delay, the mandate shall issue forthwith.